IN THE UNITED STATES DISTRICT COUREIVED
FOR MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION   2017 JUL 24  P 12: 38

| | | |
|---|---|---|
| WILLIAM GIPSON, | ) | DEBRA P. HACKETT, CLK |
| | ) | U.S. DISTRICT COURT |
| **Plaintiff,** | ) | MIDDLE DISTRICT ALA |
| | ) | **CIVIL ACTION NO.** |
| v. | ) | $2:17-cv-498$ |
| | ) | |
| HYUNDAI POWER TRANSFORMERS | ) | |
| USA, INC., | ) | |
| | ) | **PLAINTIFF DEMANDS** |
| CLAYTON PAYNE, | ) | **TRIAL BY STRUCK JURY** |
| | ) | |
| TED ARKUSZESKI, | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

## JURISDICTION AND VENUE

1.    This Complaint seeks legal and equitable relief to redress Defendants'

violations of Plaintiff William Gipson's rights secured by the following:

        a.    Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, *et*

            *seq.*, as amended;

        b.    Civil Rights Acts of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et*

            *seq.*, as amended by the Civil Rights Act of 1991; and

        c.    The laws of the State of Alabama.

1

2.      Jurisdiction is proper pursuant to the following:

a.      28 U.S.C. §§ 1331, 1343(a)(3), and 1367;

b.      42 U.S.C. § 2000e-5(f); and

c.      42 U.S.C. § 1981a.

## PARTIES

3.      Plaintiff William Gipson (hereinafter "Plaintiff" or "Gipson") brings this action based on the illegal employment practices and violations of state law by Defendant Hyundai Power Transformers USA, Inc. Gipson is a resident of Lowndes County, Alabama, and is over the age of nineteen (19). Gipson has been employed by Defendant Hyundai Power Transformers in Montgomery, Alabama at all times relevant to this Complaint.

4.      Defendant Hyundai Power Transformers USA, Inc. ("Defendant" or "HPT") is a foreign corporation conducting business in Montgomery County, Alabama.

HPT employs over fifteen (15) persons within the meaning of Title VII, 42 U.S.C. § 2000e(b). HPT is an enterprise engaged in interstate commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1).

5.      Defendant Clayton Payne (hereinafter "Defendant" or "Payne") is a resident of Chilton County, Alabama, and is over the age of nineteen (19). Payne has

2

been employed by Defendant Hyundai Power Transformers, most recently as Senior Supervisor, in Montgomery, Alabama at all times relevant to this Complaint.

6. Defendant Ted Arkuszeski (hereinafter "Defendant" or "Arkuszeski") is a resident of Elmore County, Alabama, and is over the age of nineteen (19). Arkuszeski has been employed by Defendant Hyundai Power Transformers as Plant Manager in Montgomery, Alabama at all times relevant to this Complaint.

## VENUE

7. Venue lies within the Middle District of Alabama under 28 U.S.C. § 1391.

## NATURE OF ACTION

8. Gipson brings this action to redress Defendants' unlawful employment practices, including discrimination, harassment, retaliation, and violations of Alabama state law.

9. Gipson seeks declaratory and injunctive relief, back pay, front pay, an award of compensatory, punitive, and mental anguish damages, attorneys' fees, costs, interest, and any and all such other relief the trier of fact may assess.

## ADMINISTRATIVE PROCEDURES

10. On August 11, 2016, within 180 days of learning of the acts of discrimination of which he complains, Gipson filed a Charge of Discrimination with

3

the Equal Employment Opportunity Commission (hereinafter "EEOC") alleging race discrimination, harassment, and retaliation. **(Attached herein as Exhibit A).**

11.    On December 7, 2016, within 180 days of learning of the acts of which he complains, Gipson filed a second Charge of Discrimination with the EEOC alleging further acts of race discrimination, harassment, and retaliation. **(Attached herein as Exhibit B).**

12.    On April 24, 2017, the EEOC issued Gipson a Notice of Right to Sue. **(Attached herein as Exhibit C).**

13.    Gipson has exhausted all administrative remedies and satisfied all prerequisites for bringing this action.

## STATEMENT OF FACTS

14.    Plaintiff William Gipson is an African-American male.

15.    Gipson began his employment with Hyundai Power Transformers in Montgomery, Alabama in January 2011.

16.    Gipson started on the production line earning $ 11.00 per hour.

17.    For the first nine (9) months of Gipson's employment, Gipson trained in Korea for the positions he has held in Defendant's Winding Department from September 2011 to the present.

18.    While training in Korea, Gipson received multiple awards for excellence

4

in learning how to perform the jobs he was assigned. Gipson was selected as the top trainee in the entire training class. Upon Gipson's return to the United States in September 2011, he received a $ 2.00 pay increase to $ 13.00 per hour.

19. From September 2011 to the present, Defendant has promoted Caucasian employees with less seniority, training, and experience over Gipson into higher-level, higher-paying positions.

20. Defendant hired three (3) Caucasian Supervisors over Gipson in the Winding Department from outside the company who did not complete training in Korea. None of the three (3) Caucasians that Defendant hired as Supervisors possessed the training, skills, or abilities required to successfully perform the Supervisor position. These individuals either resigned or transferred out to a different department or position within the company. Defendant nonetheless continued to pass over Gipson for a Supervisor position, despite his possessing the necessary skills, training, and qualifications for the position.

21. Defendant requested Gipson work the night shift, but Gipson requested to stay on days. Defendant nonetheless placed Gipson on night shift after offering him a Team Leader position earning $ 15.00. Defendant promised Gipson that the night shift work in that position would only last two (2) weeks. However, Defendant has continued to work Gipson on night shift since that time, rotating him from day shift to

5

night shift ever since.

22.     During the time Gipson was working as Team Leader in the Winding Department, Defendant transferred a Caucasian male, Bobby White ("White"), from Georgia to work as a Team Leader.  Defendant compensated White at $ 27.00 per hour, while compensating Gipson at $ 22.00 per hour for the same job.

23.     In 2014, Defendant finally offered Gipson a Supervisor position.  At the same time, Defendant promoted Defendant Clayton Payne ("Payne") to Supervisor. Gipson and Payne had trained in Korea at the same time, but Gipson had seven (7) additional months of Team Leader experience.  Payne is a Caucasian male.

24.     Defendant gave Payne a wage increase of over $ 1.00 more an hour than Gipson for the same Supervisor position.  Defendant had already been compensating Payne at over a $ 1.00 more per hour than Gipson in the Team Lead position.  Gipson was unaware of this pay disparity until he received the Freedom of Information Act ("FOIA") file issued by the EEOC on June 22, 2017 following its investigation of his EEOC charges.

25.     Defendant requires employees working in the Winding Department to clock in and out using a time clock.  Payne was often late to work, an issue that became known to upper management.  Gipson had no punctuality or attendance issues.

26.     While working as Team Leader, Payne dropped two (2) copper windings,

6

parts used to operate electricity transformers. The windings weighed approximately six (6) tons and were valued at $ 50,000 - $ 100,000. The company was forced to replace one of the windings, and the other winding required repairs. Per company policy, employees responsible for damage to company property valuing over $ 500.00 receive an automatic disciplinary write-up. To Gipson's knowledge, Defendant never issued Payne a write up for those violations.

27.    As Supervisors, Payne and Gipson both ran a production line in the winding shop. During this time, Gipson's shift would consistently outperform Payne's shift. As a result, Payne would complain to upper management that he did not like the employees that he managed during his shift. In response, the company allowed Payne to handpick employees that Gipson ultimately had to manage during his shift.

28.    Payne frequently used the racially derogatory term "boy" when addressing Gipson and other African-American employees. Payne did not use the term "boy" when speaking to Caucasian employees.

29.    In 2014, at least fifteen (15) employees working under Payne signed a petition complaining about adverse treatment they were receiving from Payne as their supervisor. The employees presented the petition to Tony Wojciechowski, Senior Human Resources Manager. Thereafter, Human Resources provided Payne with a copy of the petition which listed all of the names of the complainants. Upon receipt, Payne

7

verbally expressed that he was out to get everyone that signed the petition against him. Payne has indeed found ways to terminate many of the individuals who signed the petition, including African-Americans.

30.     To Gipson's knowledge, Defendant never investigated or disciplined Payne following the petition. Defendant allowed Payne to remain in his position as Supervisor. Defendant additionally allowed Payne to terminate African-American employees who signed the petition.

31.     Also in 2014, Plant Manager Ted Arkuszeski instructed Gipson to review evaluation scores of African-American employees and score them lower so he could terminate them. Gipson refused because there was no valid reason to score the African-American employees lower. Arkuszeski is a Caucasian male.

32.     After Gipson and Payne had been Supervisors for approximately a year, Defendant promoted Payne to Senior Supervisor, a position Defendant created for Payne. To Gipson's knowledge, out of the 500+ employees at the Montgomery plant, there are no other Senior Supervisor positions. This position never existed prior to 2015. Defendant created this position for Payne even though Gipson had more Team Lead experience. Payne's attendance, destruction of property, and personnel issues had also occurred prior to Defendant's promoting Payne to Senior Supervisor. Gipson did not have any attendance, destruction of property, or personnel issues, yet was not

8

even considered for the promotion.

33.    As Senior Supervisor, Payne's starting rate of pay was at least $ 25.50 per hour. Gipson, who was performing the same job without the created title, was earning significantly less per hour than Payne. Payne's and Gipson's respective job duties did not change other than the title and pay; one supervised the day shift, while the other supervised the night shift.  The only difference was that Payne began supervising Gipson.

34.    Payne, who had treated Gipson adversely before, began using his authority to treat Gipson even more adversely and undermine Gipson's authority over his team.  Gipson would give his team orders, then Payne would go behind him and give his workers different orders.  Gipson knew how to supervise his employees to make the job run smoothly, having had six (6) years of Team Lead and Supervisor experience.  There was no job-related reason for Payne to give conflicting orders to Gipson's crew, other than to demean and undermine Gipson's authority.  Payne's conflicting orders only added confusion to the work process and made it more difficult for Gipson to manage and train his employees.

35.    Payne tried to change Gipson's fixed schedule and require him to work more weekends.  On one occasion, Payne attempted to have Gipson work a Saturday that Gipson had previously requested off and that Payne, himself, had previously

9

approved. Payne threatened to give Gipson "points" if Gipson failed to work his scheduled and approved day off. Payne was attempting to accommodate a Caucasian Team Leader's request to be off on that Saturday.

36.    On another occasion, Gipson was scheduled to take a pre-approved vacation day. Defendant Ted Arkuszeski, the Plant Manager, scrutinized Gipson for taking off, repeatedly asking him intrusive questions about why he was taking off and for what reason. Gipson has never known Arkuszeski to scrutinize Caucasian employees about why they were taking off or what they intended to do on their off days.

37.    Payne hovers around Gipson and stares at him in an intimidating manner while he is performing his job. Payne does not communicate anything pertinent to Gipson about the job he is performing; he only hovers and stares to make his presence known to Gipson. If Gipson attempts to discuss the job or ask Payne a job-related question, Payne refuses to answer. Payne either ignores Gipson or looks away in a different direction, pretending he does not hear Gipson. Payne does not verbally communicate with Gipson unless he is absolutely required to do so. Payne does not treat similarly-situated Caucasian employees in the same menacing, hostile manner.

38.    Gipson is aware of Caucasian employees who are paid significantly more than him who have less seniority and fewer qualifications.

10

39. Gipson is aware of African-American employees who have been disciplined more severely than Caucasian employees that committed the same or more serious violations. Gipson has personal firsthand knowledge of an African-American forklift driver who, at the instruction of another employee, raised a forklift too high and damaged the rack on the forklift. This employee was written up immediately by the Safety Director, Ronnie Martin (Caucasian). Mr. Martin is the same supervisor who refused to discipline Payne when Payne damaged the two (2) copper windings on the job. Gipson is also aware of an African-American worker found sleeping on the job who was disciplined much more severely than a Caucasian employee found sleeping on the job.

40. In June 2016, Gipson complained of race discrimination to Tony Wojciechowski, Senior Human Resources Manager; Sang Wook Park, Chief Executive Officer; and Ted Arkuszeski, Plant Manager. Gipson specifically complained of the adverse treatment he was receiving from Payne because of his race. Defendant ignored Gipson's complaints of discrimination and harassment and failed to investigate or remedy the issues.

41. Within a month after Gipson complained of race discrimination and harassment, Defendant demoted Gipson from Supervisor to Team Leader and cut his pay from $ 24.32 to $ 23.32 per hour. Gipson asked Defendant to provide him with a

11

reason for his demotion, but Defendant refused to provide any reason to Gipson for the demotion. Payne was not demoted and was making approximately $ 26.00 per hour.

42.     Defendants were also listing Gipson's name as the terminating manager on termination documentation for African-American employees where Gipson had nothing to do with their terminations. One such African-American employee was DeAndre Sanders, who was terminated in early August 2016. Gipson had nothing to do Mr. Sanders' termination. Gipson only learned about this when Mr. Sanders called Gipson asking questions and expressing concerns about Gipson's name being on his termination paperwork. This occurred after Defendant had demoted Gipson from Supervisor to Team Lead, when he would not have had the authority to terminate employees. Gipson believes Defendants intentionally falsified personnel records of African-American employees inserting Gipson's name as making the termination decision to hide the fact that they are discriminating against African-American employees, and to lessen the likelihood that those employees could establish a discrimination claim based on race.

43.     On or about August 11, 2016, Gipson filed an EEOC charge alleging race discrimination, harassment, and retaliation. Gipson resorted to filing his charge after he received no response to his race discrimination complaints to supervisors and Defendant's Human Resources Department.

12

44.    After Gipson filed his EEOC charge, Defendant began subjecting him to increased discrimination, harassment and retaliation. The racially-charged work environment has escalated and continued since Gipson filed his charge.

45.    In November 2016, the day after Donald Trump became President-elect, Ted Arkuszeski, and Plant Manager, made racial comments to African-American employees that he did not make in the presence of Caucasian employees. Arkuszeski boasted, "This is Trump Nation (meaning the plant)!" Arkuszeski also commented that he had been complaining about Obama for eight (8) years, and finally something was done about it. At the time of Arkuszeski's comments, "Trump Nation" comments were being publicized in the news following the election. The phrase was often accompanied by the words "Whites Only," including news reports of Black churches being defaced with the terms "Trump Nation, Whites Only." Arkuszeski's comments, made only in the presence of African-American employees, did not have a work-related purpose and were made with the intent to intimidate and harass the African-American workers and specifically Plaintiff. Mr. Arkuszeski's son, Kyle, who also works for Defendant, also engaged in acts of racial intimidation and hostility toward African-American workers while touting Trump's win in the election.

46.    On that same day (the day after the election), Joey Townsend, an African American employee, walked into Plant Manager Arkuszeski's office in the Production

13

Department for a meeting. As Townsend entered his office, Arkuszeski stated, "Welcome to Trump Center." Arkuszeski repeated his comment about "Welcome to Trump Center" to the other two (2) or three (3) African-American employees who walked in for the meeting. Arkuszeski did not make these comments to any of the Caucasian employees entering the meeting. Jay Strickland and Demarion Perkins were present when Arkuszeski as Plant Manager, made these comments. Both are African-American men.

47. Mr. Arkuszeski had previously commented in Gipson's presence that he wanted to do away with Martin Luther King Day and add another day to the company's Christmas holidays.

48. The racial comments about the election were quickly circulated back to Gipson, who had recently filed his EEOC charge based on racial hostility and discrimination that specifically named Mr. Arkuszeski. Gipson and other African-American employees decided a complaint should be filed with Human Resources because of the tone and context in which the comments were made and their intent to convey racial hostility and intimidation. Gipson, having recently filed his EEOC charge and being subjected to increased discrimination and retaliation, was fearful to complain further and did not want to risk losing his job by filing another complaint with Human Resources.

14

49.     The other African-American men went to Human Resources to complain about the comments and racial hostility of Mr. Arkuszeski. Among those complaining were Kevin L. Jones, Joey Townsend, Rodney Allen, and Adrian Green. They informed Tony Wojciechowski, Senior Human Resources Manager, about the comments and told him they felt intimidated by the tone and context of the comments of Arkuszeski. Mr. Wojciechowski admitted that the comments were improper and stated that the plant was not a place to talk about "politics, sex, or religion." Wojciechowski said he would send out an email and, if the men wanted, he would have Arkuszeski apologize.    The men told Wojciechowski that, even if Arkuszeski apologized, he would not mean the apology. Wojciechowski sent out an email saying he "personally" would refrain from such topics in the workplace without addressing the issue of race head on. The men became fearful that they would be subject to retaliation for complaining about the Plant Manager and his son's racial comments.

50.     Defendant never investigated or disciplined Mr. Arkuszeski, even though his conduct violated Defendant's Standards of Conduct. Arkuszeski's comments specifically violated Standards of Conduct numbers 2, 8, 24, 49, 53, 54, and 56 of the standards in effect at the time. However, those same Standards of Conduct were used to discipline and terminate African-American employees at Hyundai Power Transformers. Arkuszeski applied Defendants' policies in a discriminatory manner to

15

terminate African-American employees, including those for whom Gipson has refused to lower evaluation scores at Arkuszeski's request.

51.     Defendant has subjected Gipson and other African-American employees to ongoing race discrimination, harassment, and retaliation. Defendant has disciplined and demoted Gipson based on race. Defendant has subjected Gipson to adverse terms, conditions, and pay in comparison to similarly-situated Caucasian employees based on race. Defendant has retaliated against Gipson through continued discrimination and escalating racial harassment after the filing of his EEOC charge. Defendants' discrimination, harassment, and retaliation of Gipson are ongoing at the present.

## COUNT ONE

### SECTION 1981 AND TITLE VII - RACE DISCRIMINATION, HARASSMENT, AND RETALIATION
### AGAINST DEFENDANT HYUNDAI POWER TRANSFORMERS

52.     Gipson re-alleges paragraphs 10-51 as if fully set forth herein.

53.     This is a claim against Defendant to redress the unlawful employment practices of race discrimination, harassment, and retaliation protected by Section 1981 of the Civil Rights Act of 1866, as amended, and Title VII of the Civil Rights Act of 1964, as amended.

54.     Gipson is African-American.

55.     Defendant treated Gipson differently and adversely in the terms,

16

conditions, and pay of his employment compared to similarly-situated Caucasian coworkers.

56.     Defendant awarded promotions to lesser-qualified Caucasian employees with less seniority.

57.     Gipson's work environment was racially hostile and harassing. Defendant required Gipson to work in a racially hostile environment filled with intimidation and ridicule by his Caucasian supervisors.

58.     Gipson's supervisor repeatedly used the word "boy" to refer to Gipson and other African-American employees.

59.     Defendant's unlawful conduct was motivated by Gipson's race.

60.     Gipson voiced complaints about the racial discrimination and harassment to his managers and HPT's Human Resources Office.

61.     Defendant failed to investigate or remedy Gipson's complaints.

62.     Defendant demoted Gipson and reduced his pay by $ 1.00 an hour approximately a month after Gipson complained.

63.     Gipson filed an EEOC charge.

64.     Defendant subjected Gipson to continued, escalating racial harassment after he complained of race discrimination and harassment to the EEOC.

65.     As a proximate result of Defendant's unlawful discrimination, harassment,

17

and retaliation, Gipson suffered financial loss, loss of dignity, loss of career opportunity, embarrassment, humiliation, emotional distress, and physical pain and suffering.

66.     Gipson seeks declaratory and injunctive relief, an award of lost back pay and front pay, compensatory and punitive damages, costs, interest, attorneys' fees, and any and all such other relief the trier of fact may assess.

## COUNT TWO

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

67.     Gipson re-alleges paragraphs 14-66 as if fully set forth herein.

68.     This is a claim against Defendants arising out of the laws of the State of Alabama prohibiting the intentional infliction of emotional distress.

69.     Defendants' adverse treatment of Gipson, in particular its subjection of his to severe, degrading, and humiliating discrimination and harassment, was outrageous, extreme, and beyond the bounds of decency.

70.     The repeated discriminatory and harassing comments of Defendants' agents and members of management were condoned and perpetuated by Defendants, despite Gipson's numerous complaints.

71.     Defendants knowingly subjected Gipson to egregious, demeaning harassment for seven (7) years, and Defendants' conduct is ongoing.

72.    Defendants' conduct is intentional, willful, and employed to inflict severe emotional distress upon Gipson.

73.    Defendants' conduct is not condoned by society and should not go unpunished.

74.    Defendants' unlawful conduct proximately caused Gipson to suffer embarrassment, humiliation, mental anguish, physical pain and suffering, loss of reputation, loss of career opportunity, and lost pay and benefits.

75.    Gipson seeks declaratory and injunctive relief, award of lost employment benefits and wages, reinstatement, back pay, front pay, compensatory damages, punitive damages, costs, interest, attorneys' fees and any and all such other relied the trier of fact may assess.

## COUNT THREE

## INVASION OF PRIVACY
## AGAINST ALL DEFENDANTS

76.    Gipson re-alleges paragraphs 14-75 as if fully set forth herein.

77.    This is a claim against Defendants for invasion of Gipson's right to privacy based on the laws of the State of Alabama.

78.    Defendants' egregious, un-remedied harassment violated and invaded Gipson's physical and emotional sanctum.

79.    Defendants' false statements about Gipson's performance, undermining of

19

Gipson's authority, and public and personal degradation of Gipson placed Gipson in a false light to others.

80.   Defendants' unlawful conduct proximately caused Gipson to suffer embarrassment, humiliation, mental anguish, physical pain and suffering, loss of reputation, loss of career opportunity, and lost pay and benefits.

81.   Gipson seeks declaratory and injunctive relief, reinstatement, an award of compensatory and punitive damages, costs, interest, attorneys' fees, and any and all such other relief the trier of fact may assess.

## COUNT FOUR

### INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONS AGAINST ALL DEFENDANTS

82.   Gipson re-alleges paragraphs 14-81 as if fully set forth herein.

83.   Gipson had established business relationships with his coworkers, subordinates, and other members of management.

84.   Defendants had knowledge of these business relationships and sought to intentionally damage them to Gipson's financial, physical, and emotional detriment.

85.   Defendants Payne and Arkuszeski interfered with Gipson's employment relationship with HPT.

86.   Gipson was damaged as a result of Defendants' intentional interference.

20

87.     Defendants' unlawful conduct proximately caused Gipson to suffer embarrassment, humiliation, mental anguish, physical pain and suffering, loss of reputation, loss of career opportunity, and lost pay and benefits.

88.     Gipson seeks declaratory and injunctive relief, reinstatement, award of compensatory and punitive damages, damages for mental anguish, costs, interest, attorneys' fees, and any and all such other relief the trier of fact may assess.

## COUNT FIVE

### NEGLIGENT AND WANTON HIRING, TRAINING, SUPERVISION AND RETENTION AGAINST ALL DEFENDANTS

89.     Gipson re-alleges paragraphs 14-88 as if fully set forth herein.

90.     This is a claim arising under the laws of the State of Alabama to redress the negligent and wanton hiring, training, supervision, and retention of Defendants' employees and members of management.

91.     Defendants had a duty to provide a reasonably safe, non-hostile, and non-discriminatory work environment to Gipson and other employees in the protected category of race.

92.     Defendants had actual notice of the actions complained of by Gipson.

93.     Defendants, having such knowledge, negligently and wantonly hired and/or failed to train, discipline, or terminate those employees and members of

21

management who actively discriminated, harassed, retaliated, and conspired against Gipson on an ongoing basis, failing to protect Gipson from further injury.

94. Defendants failed to administer, communicate, or train its managers and employees on policies against discrimination, harassment, and retaliation, or otherwise eradicate behavior that created a hostile work environment.

95. Gipson's working conditions created by Defendant were adverse and hostile and intended to cause Gipson financial, physical, and emotional harm.

96. Defendant's unlawful conduct proximately caused Gipson to suffer lost pay and benefits, embarrassment, humiliation, mental anguish, physical pain and suffering, and loss of career opportunity.

97. Gipson seeks declaratory and injunctive relief, reinstatement, award of compensatory and punitive damages, damages for mental anguish, costs, interest, attorneys' fees, and any and all such other relief the trier of fact may assess.

WHEREFORE, Plaintiff William Gipson respectfully requests this Court:

A. Grant a permanent injunction enjoining Defendants, their officers, successors, assigns, and all persons in active concert or participation with them from engaging further in discriminatory treatment on the basis of race and retaliation based on protected activity;

B. Order Defendant HPT to institute and carry out policies, practices, and

22

programs that provide equal provisions and employment opportunities for all employees, and which eradicate the efforts of past and present unlawful employment practices, including implementing a policy against race discrimination, harassment, and retaliation for engaging in protected activities;

C.      Order Defendants to make Plaintiff whole by providing back pay, front pay, costs, interest, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, compensatory and punitive damages;

D.      Award Plaintiff compensatory, punitive, and liquidated damages;

E.      Award Plaintiff costs and expenses herein, including reasonable attorneys' fees; and

F.      Award such other and further relief this Court deems necessary and proper.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL ISSUES**

Respectfully submitted,

Alicia K. Haynes (ASB-8237-E23A)
Sonya C. Edwards (ASB-8848-S73E)
Attorneys for Plaintiff William Gipson

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama  35226
Phone:  (205) 879-0377
E-mail:  akhaynes@haynes-haynes.com
E-mail:  scedwards@haynes-haynes.com


## PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL:

Hyundai Power Transformers USA, Inc.
215 Folmar Parkway
Montgomery, AL 36105

Clayton Payne
4000 County Road 350
Maplesville, AL 36750-2832

Ted Arkuszeski
1268 Politic Road
Elmore, AL  36025-1246