IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIAM GIPSON, )
)
  Plaintiff, )
)
v. )  CASE NO. 2:17-cv-498-MHT-GMB
)  [WO]
HYUNDAI POWER )
TRANSFORMERS, USA, INC., *et al.*, )
)
  Defendants. )

## <u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

Pursuant to 28 U.S.C. § 636(b)(1), this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law. Doc. 22.  Plaintiff William Gipson filed this suit against Defendants Hyundai Power Transformers, USA, Inc. ("HPT"), Clayton Payne, and Ted Arkuszeski asserting claims of race discrimination; harassment; retaliation; intentional infliction of emotional distress; invasion of privacy; interference with contractual or business relations; and negligent and wanton hiring, training, supervision, and retention. Doc. 1.  Before the court are Defendants' Motion for Summary Judgment (Doc. 71) and Motion to Strike. Doc. 92.  This court issued its initial Report and Recommendation on February 13, 2019, granting summary judgment to Defendants on all claims. Doc. 97.  On February 27, 2019, both Plaintiff and Defendants filed objections to that Report and Recommendation. Docs. 103 & 104.  Finding certain of these objections to be well founded, the court vacated its initial Report and Recommendation, and for the reasons stated below, the undersigned Magistrate Judge RECOMMENDS that the Motion for

Summary Judgment (Doc. 71) be GRANTED in part and DENIED in part, and that the Motion to Strike (Doc. 92) be GRANTED in part and DENIED in part.

## I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgement is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt

as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III.  FACTUAL BACKGROUND

Resolving all factual inferences in favor of Gipson, the nonmovant, the facts are as follows.

HPT operates a facility in Montgomery, Alabama where it manufactures electrical transformers. Doc. 72 at 5.  HPT offered Gipson a position on December 27, 2010, and he began work on January 17, 2011. Doc. 73-24 at 2–3.  Gipson was hired as a Winder Operator at a starting pay rate of $11 per hour. Doc. 73-24 at 2.  When he began his employment, HPT sent him to South Korea for a nine-month training period. Doc. 73-1 at 11–12.  Gipson is black.

Clayton Payne, a white man HPT hired on January 31, 2011, also trained in South Korea for about nine months. Docs. 73-22 at 26 & 73-7 at 12.  On April 11, 2012, HPT hired Jim Dickens as a Winding Supervisor. Doc. 73-25 at 34–35.  On March 19, 2012, HPT hired Robert White to work in the Winding Department. Doc. 73-25 at 48.  Both men were to start work on April 30, 2012. Doc. 73-25 at 34–35 & 48–49.  On April 24, 2012, HPT hired James "Jimmy" Chew as a Winding Supervisor, and he was to begin work on June 30, 2012. Doc. 73-25 at 52–53.  Dickens, White, and Chew are white.

At some point before March 19, 2012, Gipson was promoted to the position of Team Leader. Doc. 73-3 at 33.  Chew supervised both Payne and Gipson, and he rated Gipson higher than Payne on each of the four evaluations he conducted. Doc. 87-2 at 3.  Believing that Gipson generated a superior work product and possessed a better work ethic, Chew recommended Gipson for a promotion to be a supervisor in the Winding Department. Doc. 87-2 at 4.  At some point after October 27, 2013, HPT enacted a High Achiever program meant to recognize exceptional employees and reward them with additional benefits. Doc. 73-19 at 57.  Chew did not recommend Payne for a supervisor position because he did not think Payne had the requisite skill, nor does Chew recall recommending Payne for a High Achiever Award. Doc. 87-2 at 3–4.  But Human Resources Director Todd

Wojciechowski recalls that Payne was rated as a high achiever at some point during this employment, while Gipson was not. Doc. 73-3 at 53.

In the first half of 2012, Gipson's wages increased to $20 per hour and Payne's wages increased to $18 per hour. Doc. 73-19 at 56.  In October 2012, HPT determined that Payne and Gipson were eligible for raises. Doc. 73-25 at 41.  They both were recommended for increases of $0.82 per hour. Doc. 73-25 at 41.  However, Gipson received only a $0.32 cost of living increase, while Payne received a $1.00 raise. Doc. 73-25 at 41.  This set Gipson's wages at $20.32 per hour, and Payne's at $19.00 per hour.  The parties agree that this $0.68 differential has continued to affect Gipson's and Payne's wages throughout their employment with HPT. Docs. 72 at 8 & 86 at 33.  On November 26, 2012, HPT temporarily appointed Payne as acting Team Leader. Doc. 73-25 at 58.  By 2013, Payne's wages had increased to $21 per hour while Gipson made only $20.32 per hour for the same work. Doc. 73-19 at 59.  To determine an employee's compensation, HPT considers factors including the employee's skill set, performance reviews, and cost of living. Doc. 72 at 7.

Gipson and Payne both received promotions to Winding Supervisor on January 1, 2014. Docs. 73-19 at 60 & 73-21 at 25.  Upon his promotion, Gipson's salary increased to $22.32 per hour. Doc. 73-19 at 60.  Payne's salary became $23.00. Doc. 73-26 at 18.  Once they became supervisors, Gipson's production team consistently outperformed Payne's. Doc. 73-22 at 31.  As a result, Payne complained to HPT's senior management that he did not like the employees he managed. Doc. 73-22 at 31.  The company then allowed Payne to hand-pick employees from Gipson's shift for his own. Doc. 73-22 at 31.

On January 22, 2015, a number of employees in the Winding Department signed a petition complaining about Payne's leadership, disrespect of his co-workers, and lack of

managerial skills. Doc. 73-22 at 21–22.  The petitioners stated that Payne "had totally crossed the very thin line that separates the right and wrong way to speak to a co-worker," and that "he [held] no regard for his workers as men." Doc. 73-22 at 21.  The petition did not explicitly mention racial discrimination or precisely describe the type of conduct Payne's co-workers viewed to be disrespectful. Doc. 73-22 at 21–22.  But Wojciechowski testified in his deposition that the members of the Winding Department, when explaining the petition, informed him that they thought Payne was a racist. Doc. 73-3 at 120.  They also informed Wojciechowski that Payne was being hard on them because he required them to come back from breaks on time and because he enforced HPT policies, unlike Gipson. Doc. 73-3 at 120.

On September 7, 2015, HPT promoted Payne to Senior Supervisor, a position that HPT created solely for Payne. Doc. 73-22 at 26.  At this time, Payne's salary increased from $24.50 per hour to $25.50 per hour. Doc. 73-22 at 26.  Sang Wook Park, HPT's Chief Operating Officer, made the decision to promote Payne. Doc. 72 at 10.

Soon thereafter, the Winding team staged a protest of Payne's promotion to Senior Supervisor by sitting down and refusing to work. Doc. 87-1 at 2.  When this occurred, Gipson asked Plant Manager Ted Arkuszeski to talk to the men who were protesting. Doc. 87-1 at 2.  Arkuszeski responded in a nasty tone, telling Gipson, "You're behind this f*** s***, and you can handle it." Doc. 87-1 at 2.  Gipson denied that he had organized the protest. Doc. 87-1 at 2.

In 2016, HPT hired Ashlee Smith as a production specialist. Doc. 73-17 at 4.  She reported to Arkuszeski. Doc. 73-17 at 4.  At some point during her employment, Smith obtained access to company records containing current employee salaries, which

demonstrated that HPT's white employees generally received higher wages than its black employees at that time. Doc. 73-17 at 40.

In June 2016, Gipson complained to Wojciechowski, Park, and Arkuszeski about racial discrimination by Payne. Doc. 73-2 at 13.  On June 25, 2016—after this complaint— Park decided that Gipson would be demoted to Team Leader. Doc. 73-20 at 91.  The demotion became effective on July 4, 2016. Docs. 73-20 at 91 & 73-4 at 28.  The document memorializing the demotion did not explain the reason for the demotion. Doc. 73-20 at 91. After Gipson's demotion, Payne was the only supervisor in the Winding Department. Doc. 73-8 at 34.  Park made other organizational and assignment changes during his tenure, including combining the Winding and Sizing Departments to improve efficiency. Doc. 73-8 at 34.  When Gipson asked the reason for his demotion, he was not given any explanation. Doc. 73-22 at 31.

After the November 2016 presidential election, Arkuszeski made several comments to production employees about President-Elect Donald J. Trump. Doc. 73-17 at 23.  His references to "Trump Nation" were reported to the Human Resources Department by other employees who found the comments to be upsetting. Doc. 73-22 at 37.  Following these complaints, Wojciechowski sent an email instructing HPT employees to refrain from any discussion of politics or the election while working. Doc. 73-22 at 37.

HPT maintains an attendance points system for production employees whereby each employee receives a certain number of points for being late, for being absent, or for leaving early. Doc. 73-3 at 11–12.  For example, an employee may be docked half of a point for clocking in late. Doc. 73-23 at 22.  On January 19, 2017, Gipson requested leave for personal time on Saturday, January 21, 2017. Doc. 73-23 at 32.  HPT policies do not require

an employee to explain why he or she is requesting personal leave. Doc. 73-23 at 32. However, when Gipson asked for leave on January 21, Arkuszeski became angry and demanded to know why he needed the time off. Doc. 73-23 at 32. Gipson complained to Park about this interaction with Arkuszeski, after which Arkuszeski threatened Gipson and said, "Since you tagged me, I'll tag you back." Doc. 73-23 at 31–32. On January 23, 2017, Gipson provided the Human Resources Department with a written complaint about the incident. Doc. 73-23 at 31–32. In Gipson's six years of working at HPT, this was the first time a manager had demanded to know why he needed to take a personal day. Doc. 73-23 at 32. Gipson received one attendance point for failing to report to work on that Saturday. Doc. 73-23 at 22.

On August 11, 2016, Gipson filed a charge of discrimination with the EEOC, claiming that he suffered discrimination and retaliation from January 1, 2012 through July 20, 2016. Doc. 1-1. He filed this lawsuit on July 24, 2017. Doc. 1.

## IV.  DISCUSSION

Before the court can evaluate the merits of the pending Motion for Summary Judgment (Doc. 71), the court must address the challenges to the evidence offered in opposition to the summary judgment motion. Accordingly, the court will begin with Defendants' Motion to Strike (Doc. 92) and then will turn to the Motion for Summary Judgment (Doc. 71) as it applies to Gipson's state and federal claims.

### A.  Motion to Strike

Gipson supported his response to the motion for summary judgment with declarations by Roberts, Chew, and Smith. Defendants object to their use on multiple grounds. Doc. 92.

### 1.     *Declaration of Chris Roberts*

Because the declaration of Chris Roberts is not relevant and material to any issue presented in the motion for summary judgment, the portion of the motion to strike (Doc. 92) directed to his declaration is due to be denied as moot.

### 2.     *Declaration of Jimmy Chew*

Defendants move to strike the declaration of Chew (Doc. 87-2) because Chew was not previously identified as a potential witness, because the declaration contains inadmissible hearsay, and because portions of the declaration are irrelevant or immaterial. Doc. 92 at 3.

#### a.     **Failure to Disclose**

The parties agree that the question of whether certain portions of Chew's declaration should be stricken for Gipson's failure to disclose him as a witness initially turns on whether Gipson is using the statements solely for impeachment purposes. Rule 26(a)(1) requires that a party disclose the name of each individual likely to have discoverable information if the party may use that individual to support its claims or defenses unless the use would be solely for impeachment. Rule 37(c) governs sanctions available for failing to comply with Rule 26. *Murdick v. Catalina Marketing Corp.*, 496 F. Supp. 2d 1337, 1345 (M.D. Fla. 2007). This rule "provides, in relevant part, that unless there is substantial justification, or the failure to disclose is harmless, the evidence not disclosed is not to be used at trial, at a hearing, or on a motion." *Id.* But "[i]f the material is supplied for impeachment purposes only, there is no Rule 26 violation, thus Rule 37(c) is not applicable." *Id.* Therefore, if the testimony of a witness who was not previously disclosed pursuant to Rule 26(a)(1) is used solely for impeachment purposes, the testimony still may

be considered in resolving a motion for summary judgment. *See Liberty Mut. Fire Ins. Co. v. Int'l Video Distrib., LLC*, 2015 WL 11197807 (S.D. Fla. May 27, 2015); *Bearint ex rel. Bearint v. Dorell Juvenile Grp., Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004) (holding that evidence used solely for purposes of impeachment rather than for a substantive purpose is permitted under Rule 26). "Evidence is not considered to be used solely for impeachment purposes simply because it contradicts other evidence." *Paul v. Aramark Healthcare Support Servs., LLC*, 2016 WL 7888045, at *4 (N.D. Ga. June 2, 2016).

For example, in *Paul*, 2016 WL 7888045, at *5, the court determined that evidence used to demonstrate a *prima facie* case of negligence was employed for substantive purposes and not for impeachment purposes only. The plaintiff in *Paul* brought a slip-and-fall negligence action, in which he needed to prove that the defendant had knowledge of the hazard causing the slip and fall. *Id.* at *7. The plaintiff alleged that he slipped on an improperly waxed floor while at a hospital in the morning. *Id.* at 2. The defendant, a cleaning company employed by the hospital, contended that this could not be possible because it only cleaned the floors at night. *Id.* at *2. In its response to the defendant's motion for summary judgment, the plaintiff attached a declaration of a previously undisclosed witness, who stated that the defendant did not always clean the floors at the same time, and attached a photograph purportedly showing one of the defendant's employees cleaning the floor during the daytime. *Id.* Despite the plaintiff's assertion that he was using the declaration and photograph for impeachment purposes, the court found that this evidence also served the substantive purpose of establishing the *prima facie* component that the defendant knew of the hazard even if it also contradicted the defendant's contention that no hazard existed. *See id.* at *3.

Similarly, another district court sitting in the Eleventh Circuit also found that evidence used to support a plaintiff's *prima facie* case of discrimination is not used solely for impeachment purposes.  In order to establish her *prima facie* case of retaliation, the plaintiff in *Dunn-Carter v. Donahoe*, 2015 WL 1481072, at *3 (N.D. Ga. Mar. 30, 2015), had to prove that the plant manager who terminated her knew that she had engaged in protected activity (specifically, the filing of an EEOC complaint).  In its motion for summary judgment, the defendant employer argued that the plant manager did not know about the complaint. *Id.* at *3.  In her response to the motion for summary judgment, the plaintiff rebutted this assertion with the affidavits of two previously undisclosed witnesses who claimed that the plant manager did know about the EEOC complaint. *Id.*  Despite the plaintiff's assertion that she was using the witnesses solely for impeachment purposes, the court found that the plaintiff had to rely on the evidence for a substantive purpose relevant to her *prima facie* case because it proved the plant manager's knowledge of her protected activity. *Id.*

Here, the declarations under consideration relate to Chew's evaluations of Gipson and Payne.  Defendants claim that there is no dispute that Payne received a higher raise in October 2012 and a promotion in 2015 based on his superior performance. Doc. 72 at 8 & 23.  To rebut this assertion, Gipson offered the declaration of Jimmy Chew, who supervised both Payne and Gipson at the time the pay differential arose. Doc. 95 at 4. Chew, whose job as supervisor involved discipline and evaluation of employees in the Winding Department, stated that he "scored Gipson higher than Payne on all four evaluations over the two year period that [he] supervised the two men in the Winding Department." Doc. 87-2 at 3.  He also declared that he "did not recommend that Payne was

a 'high achiever' so he could receive extra pay or a higher rate of pay because of his performance." Doc. 87-2 at 3.  And Chew "never recommended that Payne should receive a higher raise than Gipson while [he] supervised the two men in the Winding Department. It is incorrect that [he] recommended in October 2012 that Gipson should receive a cost of living increase of [$0.32] per hour and Payne should receive an increase of $1.00 per hour, based on Payne's superior performance." Doc. 87-2 at 5.  Chew also declared that he thought Gipson should be promoted based on his superior work product, his work ethic, and his evaluation scores, and that Payne was not ready for a promotion because he did not have the requisite skill. Doc. 87-2 at 4.

Chew's statements thus undercut the claim that Payne's differential raise and promotion resulted from his superior performance.  However, simply because the evidence contradicts Defendants' evidence does not automatically mean that it is used only for impeachment purposes. *Paul*, 2016 WL 7888045, at *4.  For his § 1981 failure-to-promote claim, Chew's declaration is fairly characterized as solely establishing pretext by rebutting Defendants' reason for Payne's promotion.  Because pretext is not a component of Gipson's *prima facie* case, this evidence is not being used for substantive purposes, but merely to impeach Defendants' evidence.  On the other hand, Gipson cannot rely on the impeachment exception to use Chew's declaration to establish his mixed-motive wage discrimination claim.  In the wage discrimination context, Gipson attempts to use Chew's statements to establish that race was a motivating factor behind the decision to give Payne the larger raise.  To establish a *prima facie* mixed-motive claim, a plaintiff must point to evidence indicating that race was a motivating factor behind the adverse employment decision.  Chew's declaration does that for the reasons discussed above.  Accordingly, the

court concludes that Gipson is using Chew's declaration for the substantive purpose of establishing his mixed-motive wage discrimination claim, not simply for impeachment purposes.

However, the court finds that Gipson's failure to disclose Chew as a potential witness was substantially justified. *Murdick*, 496 F. Supp. 2d at 1345.   In their statement of facts in support of summary judgment, Defendants claimed that Payne consistently received higher evaluation scores than Gipson and included a chart purporting to show evaluation scores from July 2011 through December 2015. Doc. 72 at 8.  Most of the chart is not supported with evidence—neither Plaintiff's deposition exhibits, Defendants' deposition exhibits, nor the cited portions of the deposition transcripts support all of the evaluation scores depicted in the chart.   Instead, the record evidence reveals only that Gipson's average evaluation score for July 2015 through December 2015 was 63 (Doc. 73-19 at 72), that Payne's average evaluation score for July 2015 through December 2015 was 67 (Doc. 73-23 at 36), that Gipson's average evaluation score in the first half of 2014 was 74 (Doc. 73-25 at 62), and that Gipson's average evaluation score in the first half of 2015 was 62. Doc. 73-19 at 68.   Defendants have not submitted evaluations supporting the assertion that in October 2012 Payne was the superior performer.  The court has no reason to believe, on the record now before it, that Gipson had knowledge prior to the motion for summary judgment that Defendants would make these assertions or attempt to substantiate them in this way.  As a result, Gipson was substantially justified in procuring and using Chew's declaration even though he had not previously disclosed Chew as a witness, and Gipson should not be prevented from offering the Chew declaration in opposition to Defendants' motion for summary judgment.

### b.    Hearsay

Defendants contend that Chew's declaration incorporates certain statements by Wojciechowski that are inadmissible hearsay. Doc. 92 at 3.  Hearsay is an out-of-court statement offered for the truth of the matter asserted. Fed. R. Evid. 801(c)(2).  Unless an exception applies, out-of-court statements offered for the truth of their contents are inadmissible at trial. *See United States v. Lizon-Barias*, 252 F. App'x 976, 979 (11th Cir. 2007).  "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (internal citation omitted).  In other words, "inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial." *Riley v. Univ. of Ala. Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1188 (N.D. Ala. 2014).

Chew declares that Wojciechowski told him to complete his evaluations in pencil, and that he became suspicious that Wojciechowski was changing his evaluation scores. Doc. 87-2 at 3.  Gipson argues that this fact tends to show racial animus because penciled scores could be manipulated to reduce scores for black employees. Doc. 86 at 38.  The court finds that Wojciechowski's instruction to Chew would be offered for the truth of the matter asserted—that Wojciechowski did indeed tell Chew to complete his evaluations in pencil.  The court is not aware of an exception to the hearsay rule which would make the statement admissible at trial, and Gipson has not identified an exception or otherwise argued that Wojciechowski's statement can be reduced to an admissible form at trial. Accordingly, the motion to strike Wojciechowski's direction to complete the evaluation in pencil should be granted.

### c.     Relevance

Defendants' relevance objection is due to be sustained in part. There are many portions of Chew's declaration that are not relevant and material to the motion for summary judgment, and they have not been considered by the court or incorporated into the statement of facts set forth above.

Defendants' objection on relevance grounds to Chew's denial that he recommended Payne for a High Achiever Award, however, is due to be overruled. Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and if the fact is of consequence in determining the action. Fed. R. Evid. 401. Defendants argue that whether Chew recommended Payne for a High Achiever Award is irrelevant and immaterial because Chew was not the decisionmaker for the pay raises. Doc. 92 at 4. But the fact that Payne's supervisor did not recognize him as a high achiever does make the fact at issue—that Payne received a higher pay raise due to his superior performance—less probable. And this fact is of consequence in determining whether Gipson has a valid disparate treatment claim in as much as it may be material to ascertaining whether Payne received a higher pay raise due to his superior performance or due to his race. Accordingly, whether Chew recommended Payne for this award is relevant and material to the issues presented in the pending motion for summary judgment.

### 3.     *Declaration of Ashlee Smith*

Smith's declaration describes certain out-of-court statements made by Payne and Arkuszeski, but these statements are hearsay that cannot be reduced to an admissible form at trial. Gipson argues that these portions of the declaration fit within the Federal Rule of Evidence 801(d)(2)'s definition of non-hearsay statements that are offered against an

opposing party. Fed. R. Evid. 801(d)(2).  An opposing party statement is not hearsay if it was made by the party's employee on a matter within the scope of that relationship and while that relationship existed. Fed. R. Evid. 801(d)(2)(D).  In other words, to be admissible under this exception, the content of the statement must concern a matter within the scope of the employee's agency or employment. *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565 (11th Cir. 1991).

There is no dispute that Payne and Arkuszeski were employees of HPT and that the statements were made while the employment relationship existed.  Thus, the question is whether the statements concerned a matter within the scope of Payne's and Arkuszeski's employment.  Here, "the inquiry is whether [the declarant] was authorized to act for his principal . . . concerning the matter about which he allegedly spoke." *Wilkinson*, 920 F.2d at 1566 (citing *Process Control v. Tullahoma Hot Mix Paving Co.*, 79 F.R.D. 223, 225 (1977)).  "In employment discrimination cases, this means that 'the declarant must be involved in the decision making process affecting the employment action involved.'" *Robinson v. City of Atlanta*, 2012 WL 12836657, at *6 (N.D. Ga. July 27, 2012) (quoting *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003)); *see also Horne v. Turner Const. Co.*, 136 F. App'x 289, 292 (11th Cir. 2005) (finding that supervisors had the authority to hire and fire employees and therefore their statements were admissible and within the scope of the supervisors' authority); *Zaben v. Air Prod. & Chem., Inc.*, 129 F.3d 1453, 1546 (11th Cir. 1997) ("[S]tatements made by a supervisory official who plays some role in the decision making process are generally admissible.").  For this reason, it is not enough to establish simply that Payne's comments related to the individuals he supervised or that Arkuszeski's comments related to the management of the plant, and Gipson has

presented no evidence demonstrating that Payne or Arkuszeski had the supervisory authority to hire or fire individuals in the Winding Department. Moreover, as discussed below, Gipson has not shown that Payne or Arkuszeski were decisionmakers with respect to any adverse employment action. Because Gipson has failed to establish that the statements of Payne and Arkuszeski were made within the scope of their agency or employment, he cannot rely on the Rule 801(d)(2)(D) exception to the hearsay rule.

Accordingly, the motion to strike is due to be granted as to the statements of Payne and Arkuszeski contained in Ashlee Smith's declaration. The other portions of Smith's declaration are not relevant and material to the motion for summary judgment and the motion to strike otherwise should be denied as moot.

## B.    Motion for Summary Judgment

### 1.    State-Law Claims

In response to the motion for summary judgment, Gipson states that he "voluntarily dismisses" his state-law claims against HPT, Payne, and Arkuszeski for intentional infliction of emotional distress; invasion of privacy; intentional interference with contractual or business relations; and negligent and wanton hiring, training, supervision, and retention. Doc. 86 at 41. Gipson has not filed a motion seeking the dismissal of these claims pursuant to Federal Rule of Civil Procedure 41(a)(2) or complied with Rule 41(a)(1), and the court therefore considers the purported "voluntary dismissal" to be an admission that summary judgment is appropriate on these claims.

The mere fact that a motion for summary judgment is unopposed does not relieve the court of its obligation to consider the merits of the motion. *U.S. v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir.

2004).  The district court need not conduct a *sua sponte* review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion is supported by evidentiary materials and review all of the evidentiary materials submitted in support of the motion for summary judgment. *Id.* at 1101–02.  Accordingly, the court has reviewed Defendants' evidentiary materials in accordance with Rule 56 of the Federal Rules of Civil Procedure.

Under Rule 56, the party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The movant meets this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

In the instant case, Defendants have met this burden.  They have articulated several bases for summary judgment as to Gipson's claims, supporting the motion with exhibits memorializing Gipson's change in employment status; a Team Member Handbook containing HPT's discrimination and harassment policies; the deposition testimony of Park, Payne, and Arkuszeski; and testimony from Gipson himself.

Once the moving party has met its burden, Rule 56(e) of the Federal Rules of Civil Procedure "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S.

at 324.   If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. Fed. R. Civ. Pro. 56(e).

By failing to respond to the motion for summary judgment on his state-law claims, Gipson has failed to meet his burden under Rule 56.   Further, the court has reviewed the evidentiary materials submitted by Defendants and finds no question of fact as to any material issue raised by Defendants as a ground for summary judgment.   Accordingly, summary judgment is appropriate on Gipson's state-law claims, and Defendants Payne and Arkuszeski should be dismissed as parties to this action.   All remaining claims are stated against HPT.

### 2.   *Title VII and § 1981 Harassment Claims*

By failing to address these claims in his response to the motion for summary judgment, Gipson abandons them.   "A party that fails to defend a claim that is targeted by a summary judgment motion is deemed to have abandoned that claim." *Adams v. Bank of Am., N.A.*, 237 F. Supp. 3d 1189, 1203 (N.D. Ala. 2017); *see also Wilkerson*, 270 F.3d at 1322 (affirming that a claim is abandoned where presented in the complaint but not raised in a party's response to motion for summary judgment or in the party's own motion for summary judgment); *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 625–626 (11th Cir. 2007) (finding claim abandoned where plaintiff mentions the claim in her statement of facts but fails to address defendant's arguments regarding the claim in response to a motion for summary judgment); *Crayton v. Valued Servs. of Ala., LLC*, 737 F. Supp. 3d 1320, 1330 (M.D. Ala. 2010) (holding that the plaintiff's failure to address defendant's arguments with respect to retaliation claims amounts to an abandonment of these claims).

In its motion for summary judgment, HPT argues that Gipson cannot prove a *prima*

19

*facie* case of harassment because (1) the harassment was not sufficiently severe or pervasive as to alter the terms and conditions of Gipson's employment, and (2) HPT took reasonable care to prevent and promptly correct any harassing behavior. Doc. 72 at 35–38. Gipson failed to respond to these arguments in his brief. Accordingly, Gipson abandoned his Title VII and § 1981 claims of harassment.

### 3.   *Failure-to-Promote Claims*

Gipson asserts a Title VII failure-to-promote claim and Section 1981 failure-to-promote claim regarding Payne's promotion to Senior Supervisor on September 7, 2015. Doc. 86 at 31. The Title VII failure-to-promote claim is time-barred, but the § 1981 claim is timely.

### a.   **Title VII Claim**

Before a plaintiff may litigate a claim for discrimination under Title VII, he must exhaust his administrative remedies. *See Rizo v. Ala. Dep't of Human Res.*, 228 F. App'x 832, 835 (11th Cir. 2007) (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1314 (11th Cir. 2001)). This begins with the filing of a charge of discrimination with the EEOC. *Id.* "EEOC regulations interpret the relevant Title VII provisions to mean that a charge is 'filed' when the Commission receives it." *Pouyeh v. Univ. of Ala. Dep't of Op.*, 66 F. Supp. 3d 1375, 1380 (N.D. Ala. 2014); *see also* 29 C.F.R. § 1601.13(a). Title VII provides that a charge of discrimination "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). This requirement "erects an absolute bar on recovery for discrete discriminatory or retaliatory acts occurring outside the limitations period." *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169,

1178 (11th Cir. 2005) (internal quotations and citation omitted). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. A failure to receive a promotion is considered to be a discrete and separate unlawful employment practice. *Id.* at 114. "A party, therefore, must file a charge within" 180 days of the failure to promote "or lose the ability to recover for it." *Ledbetter*, 421 F.3d at 1179. Gipson filed his charge of discrimination with the EEOC on August 11, 2016 (Doc. 1-1), so any timely act of discrimination must have occurred no earlier than February 14, 2016. Payne was promoted to Senior Supervisor in 2015, falling well outside of the 180-day time bar.

To the extent it could be argued that Gipson's failure-to-promote claim is timely because it falls within the purview Lilly Ledbetter Fair Pay Act, that act does not operate on discrete failure-to-promote claims. Under the Lilly Ledbetter Fair Pay Act, "an unlawful employment act occurs each time an employee is paid under a discriminatory compensation scheme." *Hester v. North Ala. Ctr. for Educ. Excellence*, 353 F. App'x 242, 243 (11th Cir. 2009). In other words, "the 180-day limitations period does not start running once and for all as soon as the plaintiff begins to suffer discrimination, or even when he first becomes cognizant of it." *Gibbons v. Auburn Univ. at Montgomery*, 108 F. Supp. 2d 1311, 1316 (M.D. Ala. 2000). "In such instances, so long as the plaintiff files suit within 180 days after the last instance of discrimination, the suit is considered timely." *Id.* Thus, for purposes of timeliness, a wage discrimination claim refreshes with each paycheck.

The act is not so broad, however, as to reach failure-to-promote claims. *See Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374 (D.C. Cir. 2010) ("[I]n employment law the phrase 'discrimination in compensation' means paying different wages or

providing different benefits to similarly situated employees, not promoting one employee but not another . . . . In context, therefore, we do not understand 'compensation decision or other practice' to refer to the decision to promote one employee but not another."); *Reiff v. Bd. of Regents of the Univ. of Wis. Sys.*, 2014 WL 4546041, *5 (W.D. Wis. Sept 12, 2014) ("[Failure to promote] decisions are not 'discrimination in compensation' decisions within the meaning of the Equal Pay Act, as amended by the Lilly Ledbetter Fair Pay Act. They do not give rise to discriminatory compensation claims that are refreshed with each new discriminatory paycheck.").  Furthermore, district courts in the Eleventh Circuit have held that under Title VII the denial of a promotion is one-time violation, the consequences of which are felt at the present time. *Johnson v. Austal, U.S.A., L.L.C.*, 805 F. Supp. 2d 1299, 1308 (S.D. Ala. 2011) (internal citation omitted).  Consistent with this authority, it would be improper to blend together the two, separate employment actions—Gipson's failure-to-promote claim and his wage discrimination claim—for limitations purposes.  Each is treated differently, and the Title VII failure-to-promote claim is untimely notwithstanding the Lilly Ledbetter Fair Pay Act.  Accordingly, Gipson did not exhaust his administrative remedies as to his Title VII failure-to-promote claim, and summary judgment should be granted on this claim.

### b.     Section 1981 Claim

The statute of limitations period for Gipson's failure-to-promote claim under § 1981 is either two years or four years, depending on whether the claim was actionable before Congress amended § 1981 in 1991. *See Brown v. Huntsville City Bd. of Educ.*, 324 F.R.D. 239, 254–256 (N.D. Ala. 2018).  "Section 1981, like many other federal statutes . . . does not contain a specific statute of limitations." *Id.*  In this circumstance, the Supreme

Court has instructed district courts to apply the most appropriate state statute of limitations, which in Alabama is two years. *Id.*  "That general rule was limited to some extent on December 1, 1990, when Congress created a 'catchall' four-year statute of limitations that applies to civil actions arising under federal statutes enacted after the effective date of that statute, but not containing a specific statute of limitations." *Id.* at 253.  Thus, if a claim is brought under the original language of § 1981, the two-year statute of limitations applies, but if a claim is brought pursuant to the newest version of § 1981, the catchall four-year statute of limitations applies.

The original language of § 1981 is as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.  In *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), the United States Supreme Court interpreted this language to encompass only acts of discrimination that occurred before the formation of the employment contract. *Brown*, 324 F.R.D. at 253. Even this narrow interpretation includes some failure-to-promote claims. *Id.* at 254.  The *Patterson* court held that "the question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in positions was such that it involved the opportunity to enter into a new contract with the employer." *Patterson*, 491 U.S. at 218.

For example, the Eleventh Circuit determined in *Price v. M & H Valve Company*, 177 F. App'x 1, 10 (11th Cir. 2006), that a racially based failure-to-promote claim could be actionable under the original language of § 1981.  In that case, the plaintiff's EEOC

charge asserted that his employer "denied him the opportunity to apply for a supervisory position because of his race by failing to advertise vacant supervisory positions and by promoting Caucasian employees, instead of more qualified African-American employees." *Id.* The plaintiff claimed that the four-year statute of limitations applied to his failure-to-promote claim and that this claim was viable because his employer "used an informal, secretive selection process based on subjective criteria." *Id.* at 9. The court held that the plaintiff's assertion that the defendant "failed to promote him because of his race" meant that "his § 1981 claims were cognizable under *Patterson*, and, thus, time barred under Alabama's two-year statute of limitations." *Id.* at 10.

Likewise, Gipson's failure-to-promote claim was available under the original language of § 1981, and therefore is subject to the two-year limitations period. As in *Price*, where the plaintiff alleged that he was denied a promotion to a supervisory position in favor of a less qualified white employee, Gipson asserts that he was denied the Senior Supervisor promotion in favor of the less qualified and white Payne. Doc. 86 at 40. And, like in *Price*, where the plaintiff argued that his employer failed to advertise the position, HPT failed to advertise the Senior Supervisor position. Doc. 86 at 40. Again paralleling *Price*, where the employer allegedly used a secretive selection process, Gipson claims that HPT did not promote Payne in an open and fair process. Doc. 86 at 40–41. Accordingly, *Price* controls the outcome here, and Gipson's § 1981 failure-to-promote claim is subject to Alabama's two-year statute of limitations. However, regardless of whether the two-year or four-year statute of limitations applies, Gipson's failure-to-promote claim is timely under § 1981 because he filed this case on July 24, 2017, less than two years after Payne was promoted to Senior Supervisor on September 7, 2015.

From a substantive standpoint, Gipson's briefing does not reveal which theory for proving discrimination he intends to invoke.  In a section entitled "Substantive Law Applicable to Plaintiff's Discrimination Claims," Gipson states that Defendants "erroneously [presume] that Gipson is pursuing his Title VII claims under the *McDonnell Douglas* construct, rather than under the 'motivating factor' analysis." Doc. 86 at 30.  But Gipson says nothing regarding his § 1981 claims, and he cites to no law in a subsection entitled "A Reasonable Jury Could Conclude That Gipson Was Denied Advancement Because Of His Race" under the heading "Plaintiff's Demotion/Promotion Claims." Doc. 86 at 40.  When relying on circumstantial evidence, there are three possible theories under which a plaintiff may bring a failure-to-promote claim: the *McDonnell Douglas* framework, the "convincing mosaic" standard, and the mixed-motive standard.[1]  Because Gipson has not clearly elected a theory, the court must analyze the alternatives to determine whether any theory survives summary judgment, and will begin by addressing whether Gipson has presented a sufficient failure-to-promote claim under the *McDonnell Douglas* scheme.

In cases where direct evidence is lacking, courts often analyze a plaintiff's claims under the familiar *McDonnell Douglas* framework, which requires the plaintiff to create an inference of discrimination through his *prima facie* case. *Springer*, 509 F.3d at 1347.  To establish a *prima facie* case of a failure to promote under the *McDonnell Douglas* framework, the plaintiff has the initial burden of showing (1) that the plaintiff belongs to a

---

[1] Title VII and § 1981 have the same requirements of proof and present the same analytical framework. *Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1330 (11th Cir. 1998); *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1344 n.1 (11th Cir. 2007).

protected class, (2) that he applied for and was qualified for a promotion, (3) that he was rejected despite his qualifications, and (4) that another equally or less-qualified employee outside his class was promoted. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). "However, where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second prong that he applied for the position—only that the employer had some reason to consider him for the post." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005). When an employer uses informal methods, it has a duty to consider all those who might reasonably be interested, as well as those who explicitly expressed an interest in such a position. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir. 1984). And a plaintiff need only show that he satisfied an employer's objective qualifications to demonstrate that he was qualified for the position. *Id.* at 769. As a result, it has been observed that the "burden of establishing a *prima facie* case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here, Gipson belongs to a protected class because he is black. And HPT had a duty to consider Gipson as someone who might reasonably be interested in the position because he applied for and accepted other promotions in the past (Doc. 73-21 at 104), and he held the same title as Payne at the time HPT created the Senior Supervisor position. The qualifications for the job appear to center around department productivity and the enforcement of HPT's rules and policies. *See* Doc. 72 at 24. For purposes of the *prima facie* case, Gipson has demonstrated that he was qualified for the position, as he contends that he had more experience than Payne, that he did not have attendance issues, and that

his shift consistently outperformed Payne's shift.[2] Doc. 73-22 at 28–32.  As to the fourth element, HPT contends that Gipson cannot show that he was equally or better-qualified than Payne for the Senior Supervisor position because Payne received higher performance evaluations and skill ratings than Gipson, and because other HPT employees complained that Gipson was not productive, did not enforce rules and policies, and did not require his team members to be productive. Doc. 72 at 23–24; Doc. 73-8 at 27 & 46.  However, because Gipson contends that he was more experienced than Payne and that his shift outperformed Payne's, there is a genuine dispute as to whether Payne was more productive than Gipson.

"If a plaintiff makes the requisite showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Brown*, 597 F.3d at 1174.  This is a burden of production, not persuasion. *Vessels*, 408 F.3d at 769.  "As this burden involves no credibility determination, it has been characterized as exceedingly light." *Id.* (internal citations and quotations omitted).  If the employer articulates one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason is pretext for illegal discrimination. *Brown*, 597 F.3d at 1174.  At this stage of the analysis, the employer may rely on its subjective criteria and evaluations of the plaintiff. *Vessels*, 408 F.3d at 769.

---

[2] "On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 799 (11th Cir. 2005).  "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012).  Additionally, under "28 U.S.C. § 1746, a declaration that is signed 'under penalty of perjury' is sufficient to constitute evidence for purposes of a motion for summary judgment." *Leslie v. Greene*, 2015 WL 427019, at *7 (M.D. Ala. Feb. 2, 2015).  Here, not only can Gipson's statements be reduced to an admissible form by having him testify at trial, these statements were made under oath when he filed his sworn charge of discrimination with the EEOC.

HPT contends that Park promoted Payne based on his observations and his assessment that Payne had better leadership skills and enforced rules and policies, whereas Gipson allegedly did not enforce rules and policies and allowed his team members to be less efficient and less productive. Doc. 72 at 11.  HPT further asserts that Park promoted Payne as part of his efforts to reorganize the Winding and Sizing Departments in order to improve their efficiency and consistency. Doc. 72 at 29.  HPT argues that Park's decision was consistent with the men's past performance reviews, skill set, and statements made by trainers and team members in the Winding Department. Doc. 72 at 29.  To support its assertions, HPT cites to the depositions of Gipson, Payne, Park, Wojciechowski, and Arkuszeski. Doc. 72 at 10, 12–13 & 29.  Performance evaluations for the second half of 2015 also show that Payne received a better performance review than Gipson. Docs. 73-19 at 72–73 & 73-23 at 36.

Because HPT met its burden to articulate a non-discriminatory reason for its actions, the presumption of discrimination is eliminated, and Gipson must come forward with evidence sufficient to permit a reasonable factfinder to conclude that the legitimate reasons given were not HPT's true reasons and were a pretext for discrimination. *See Vessels*, 408 F.3d at 763, 771.  To demonstrate pretext, a plaintiff may use the previously produced evidence establishing the *prima facie* case. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000).  "In determining pretext, we evaluate whether the plaintiff demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Price*, 177 F. App'x at 12 (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  "If the plaintiff does not proffer sufficient

evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment of the plaintiff's claim." *Chapman*, 229 F.3d at 1024–25. "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Gipson raises genuine issues of material fact as to the sincerity of HPT's proffered race-neutral reasons for its decision to promote Payne over him. First, Gipson has presented evidence calling into question Payne's leadership skills and productivity. For example, Gipson presented evidence that fifteen employees working under Payne signed a petition against him, complaining about his lack of leadership and "utter lack of managerial skills." Doc. 73-22 at 21–22. The employees complained about Payne's disrespect toward them and requested a leader that had not only vast knowledge in Winding, but the managerial skills necessary to run the Department. Doc. 73-22 at 21. Gipson also swore under penalty of perjury that his production line shift consistently outperformed Payne's shift. Doc. 73-22 at 31.

Second, Gipson presented evidence casting doubt on HPT's assertion that Park's decision was consistent with the men's past performance reviews. In 2013, two years before Payne was promoted, Gipson's supervisor, Chew, recommended him for a promotion instead of Payne. Doc. 87-2 at 4. Chew also scored Gipson higher than Payne on all four evaluations he completed for the two men. Doc. 87-2 at 3. Although HPT claims that Payne was evaluated favorably in 2012 and 2014, it has not produced the relevant evaluations, as discussed above. Because there is dispute as to this material fact, summary

judgment on Gipson's § 1981 failure-to-promote claim should be denied.

### 4. Title VII and § 1981 Race Discrimination Claims

The court now turns to Gipson's claims for (1) racially disparate treatment regarding the 2012 pay raises and (2) racially disparate treatment involving his demotion in 2017. Plaintiffs may prove discrimination claims using either the traditional *McDonnell Douglas* framework or a mixed-motive theory to defeat summary judgment.[3] *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016). To make out a *prima facie* case of racial discrimination under *McDonnell Douglas*, a plaintiff must show that (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to adverse employment action; and (4) his employer treated similarly situated employees outside his class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

A plaintiff who brings a mixed-motive claim, however, need only produce direct or circumstantial evidence "sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1232–33 (internal citation omitted). In this way, a plaintiff may succeed on a mixed-motive claim by showing that illegal bias "was a motivating factor for an adverse employment action, even though other factors also motivated the action." *Id.* at 1235; *see also Burton v. Gwinnett Cnty. Sch. Dist.*, 2018 WL 6259631, at *2 (11th Cir. Nov. 28, 2018). In a mixed-motive case, an employer may fire an employee for any reason as long as

---

[3] "[C]laims brought under Title VII and § 1981 all require proof of discriminatory intent, and each claim is analyzed in the same manner." *See Gosa v. Wal-Mart Stores East, LP*, 2017 WL 457198, at *7 (S.D. Ala. Feb. 2, 2017) (applying mixed-motive theory to both Title VII and § 1981 claims for disparate treatment).

discrimination did not play a role in that decision. *See Williams v. Fla. Atlantic Univ.*, 728 F. App'x 996, 1000 (11th Cir. 2018). Under this theory, the ultimate burden of persuasion is on the employee, not the employer, to demonstrate that race was a motivating factor. *E.g.*, *Nassar*, 570 U.S. at 364 ("To establish discrimination, all agree, the complaining party need show only that race . . . was a 'motivating factor' in an employer's adverse action.") (Ginsburg, J., dissenting); *Gibbons*, 108 F. Supp. 2d at 1315 ("Notwithstanding the shift in the burden of production subsequent to the employee's presentation of a prima-facie case, the employee retains the ultimate burden of persuasion on the question of whether discrimination occurred.").

Gipson alleges that the following adverse actions were motived by race: (1) the differential between Payne's wages and his own, which began in 2012; and (2) his demotion from Supervisor to Team Leader. Doc. 86 at 33–41. HPT contends that Gipson's race discrimination claim fails under the traditional framework because (1) he cannot establish a *prima facie* case of discrimination; (2) HPT had a legitimate, non-discriminatory reason for its actions; and (3) Gipson cannot establish pretext. Doc. 72 at 22. HPT argues that Gipson's claims fail under a mixed-motive theory because he cannot establish that race was a motivating factor in either decision. Doc. 91 at 22. Because these employment actions are adverse to Gipson's interests,[4] the only question for the court to resolve under the mixed-motive theory is whether Gipson has presented sufficient evidence for a

---

[4] To show that he suffered an adverse employment action, a plaintiff must establish that he suffered a materially adverse change in the terms or conditions of employment. *Davis v. Town Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001); *see also Crawford v. Carroll*, 529 F.3d 961, 971 (11th Cir. 2008) (finding that termination, failure to hire, and demotion are adverse employment actions); *Meeks v. Comp. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (holding that to establish a *prima facie* case of disparate pay a plaintiff must show that she occupies a position similar to that of a higher paid employee who is not a member of her protected class).

reasonable jury to conclude that his race was a motivating factor behind the actions. *See Quigg*, 814 F.3d at 1241 (finding that employer's non-renewal of employment contract "was clearly an adverse employment action, [so] the only question before us is whether [the plaintiff] has presented sufficient evidence for a reasonable jury to conclude that her sex or gender was a motivating factor in the decision not to renew her contract"). The court addresses each adverse action in turn.

### a.   Wage Discrimination

Gipson claims that HPT intentionally discriminated against him in October 2012 when he received a $0.32 raise and Payne received a $1.00 raise even though both men had been recommended for a $0.82 raise. Doc. 86 at 34. Gipson avers that he is asserting a mixed-motive claim, not a claim under the *McDonnell Douglas* construct. Doc. 86 at 30. Nevertheless, the court will analyze his claim under both standards.

### i.   Mixed-Motive

"[T]he plaintiff will always survive summary judgment if [he] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Metro Mech., Inc.*, 2018 WL 164410, at *3 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). As mentioned above, to establish a disparate treatment claim, a plaintiff generally must show that (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to adverse employment action; and (4) his employer treated similarly situated employees outside his class more favorably. *Crawford*, 529 F.3d at 970. A plaintiff advocating a mixed-motive theory can succeed even when a nondiscriminatory reason was a motivating factor as long as a discriminatory reason also served as a motivating factor. *Quigg*, 814 F.3d at 1235.

Here a dispute of material fact exists as to whether race was a motivating factor behind the October 2012 decision.[5]

As a threshold matter, Gipson has not pointed to any evidence identifying the individual at HPT who made the decision to increase his wages less than Payne's. If Gipson were traveling under a *McDonnell-Douglas* theory, some courts have held that the failure to identify a decisionmaker alone is fatal to a discrimination claim. *See Goddard v. City of Atlanta*, 2007 WL 9700876, at *14 (N.D. Ga. Aug. 10, 2007) ("Plaintiff has failed to identify any individuals who were decisionmakers in his termination. As a result, he cannot show that the decisionmakers treated employees outside of Plaintiff's protected class differently."). While this court does not find that an unidentified decisionmaker in and of itself defeats Gipson's claim, this evidentiary void impacts the court's analysis of Gipson's evidence of racial animus and its connection to the challenged decision.[6]

To show that race was a motivating factor behind the 2012 decision to increase Payne's wages more than Gipson's, Gipson relies on several pieces of evidence. First, he

---

[5] As earlier noted, pursuant to the Lilly Ledbetter Fair Pay Act of 2009, the statute of limitations for filing an EEOC charge alleging pay discrimination resets with each paycheck affected by a discriminatory decision. *See Hester v. N. Ala. Ctr. for Educ. Excellence*, 353 F. App'x 242, 243–44 (11th Cir. 2009); *Short v. Immokalee Water & Sewer Dist.*, 165 F. Supp. 3d 1129, 1144 (M.D. Fla. 2016). Both parties agree that the 2012 wage gap has continued to affect Gipson's and Payne's relative wages throughout their employment. For this reason, the statute of limitations for this claim resets with each paycheck. *See Hester*, 353 F. App'x at 244.

[6] In their objections to the prior report and recommendation, Defendants contend that C.G. Son was responsible for the October 2012 pay decision. Doc. 108 at 8. But the evidence upon which Defendants rely does not clearly establish that Son was the decisionmaker. For example, Defendants cite to Wojciechowski's deposition, in which he states that the decisionmaker who hired Dickens was Son, who was director of the Winding Department in 2012. Doc. 73-3 at 32–33. Defendants also point to evidence showing that Son made pay decisions prior to 2014; however, the evidence does not show at what time prior to 2014 that Son made these decisions. Doc. 73-3 at 46. And while Defendants cite to evidence demonstrating that the directors of the Department were responsible for promotions and demotions (Doc. 73-4 at 28), they do not provide clear evidence establishing that directors were responsible for decisions about salary, and the evidence demonstrating that Son evaluated Payne and Gipson prior to October 2012 does not establish that Son was responsible for the October 2012 wage gap. Doc. 73-5.

presents evidence calling into question HPT's proffered explanation (Payne's "superior performance") for the wage gap. Doc. 86 at 35.   Second, he asserts that Chew was instructed to complete his evaluations in pencil so that his supervisors could alter the scores. Doc. 86 at 36.   Third, Gipson argues that the evaluations from 2015 demonstrate that he was graded more harshly than Payne. Doc. 86 at 36.   Fourth, Gipson contends that he was instructed to lower the scores of black employees so that Arkuszeski could fire them. Doc. 86 at 37.   Finally, Gipson relies on Smith's testimony that white employees generally were paid more than black and Korean employees. Doc. 86 at 37.[7]   The court addresses each category of evidence in turn.

The majority of Gipson's circumstantial evidence does little to show whether HPT actually relied on his race in making the promotion decision. *See Quigg*, 814 F.3d at 1241 (citing *Price Waterhouse v. Hopkins*, 109 S. Ct. 1775, 1791 (1989)).   For example, the claim that Chew was instructed to use pencil for his evaluations is, as discussed above, based entirely on inadmissible hearsay, and therefore cannot be considered.   Gipson's claim that he was graded more harshly than Payne is based on their 2015 evaluations (Docs. 73-19 at 72–73 & 73-23 at 36), but regardless of whether the evaluations reveal racially motivated "harsh" grading or merely expose the limitations in a subjective evaluation system, these 2015 evaluations were conducted three years after the 2012 decisions under consideration.   Without a close temporal connection, and particularly when the 2012 decisionmaker and any relationship he or she had to the 2015 evaluation process is

---

[7] In her deposition, Smith contends that she has evidence of certain employees' "most recent" and current salaries. Doc. 73-17 at 39.  She testified that she obtained this evidence about a month before her deposition, around April 2018. Doc. 73-17 at 39.

unknown, the 2015 evaluations are not significantly probative of whether racial bias infected the 2012 decision. Smith's testimony that she obtained a document revealing that black employees' wages generally were lower than other employees' wages suffers from the same problem because Smith was not hired until 2016—and also glosses over any variances in the employees' responsibilities, experience, and skill. Finally, Gipson's contention that he was instructed to lower the scores of black employees is not supported by the record evidence to which he cites.[8]

Despite the irrelevance and lack of persuasiveness inherent in much of Gipson's circumstantial evidence, the court concludes that he has established a genuine dispute of material fact as to HPT's proffered reason for the wage differential. HPT contends that the "October 2012 pay decision was made based on Payne's superior performance and skill set, as reflected by his evaluations and ratings." Doc. 72 at 29. But, as previously discussed, HPT has not provided the evaluations demonstrating that Payne was more highly rated at the time of the decision. In addition, Chew's declaration establishes that as the supervisor of the Winding Department he rated Gipson higher than Payne from June 2012 through January 2014 and calls into question HPT's explanation that Payne was paid more because of his superior performance. Doc. 87-2 at 3. Chew also declared that he never

---

[8] For this evidence, Gipson cites to page 236:8–11 of document 73-1, but document 73-1 does not have 236 pages. On pages 134 to 136, however, Gipson references an instruction to lower certain evaluation scores. For this reason, the court assumes that Gipson intended to rely on this portion of his deposition transcript. Yet even this passage does not support Gipson's argument. The deposition testimony on which Gipson presumably relies is as follows: "Okay. The last sentence of that paragraph says: In addition, the company allowed Payne to terminate some of the African American employees that signed . . . ." Doc. 73-2 at 16. In another portion of his deposition, Gipson mentions that Arkuszeski questioned his high evaluations and instructed him to "ramp it back on employees and give them sixes unless they do something real extraordinary." Doc. 73-1 at 35. However, as Gipson testified, Arkuszeski gave this instruction at a group meeting, and Gipson has not identified any evidence in the record indicating that the instruction was meant to apply only to evaluations of black employees.

recommended Payne for a larger raise than Gipson. Doc. 87-2 at 5. Demonstrating the falsity of HPT's proffered reason for the disparate raises may be enough to convince a reasonable juror that race was one of the motivating factors behind the October 2012 decision. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) ("The 'ultimate question' in a mixed-motive analysis is simply 'whether there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision.'"). Because there is a genuine dispute as to this fact, summary judgment as to Gipson's wage discrimination claim is not appropriate.

### ii. *McDonnell Douglas*

Although it survives summary judgment under a mixed-motive theory, HPT would be due summary judgment on Gipson's wage discrimination claim under a traditional *McDonnell Douglas* theory. "Many articulations of the prima-facie case exist, but the essence of the prima-facie case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact finder that the employer used prohibited criteria in making an adverse decision about the employee." *Gibbons*, 108 F. Supp. 2d at 1315. To establish a *prima facie* case of intentional wage discrimination, "a plaintiff must establish that (1) she belongs to a protected class; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." *Givens v. Chambers*, 548 F. Supp. 2d 1259, 1274 (M.D. Ala. 2008) (internal quotation and citation omitted). The standard also has been articulated as requiring the plaintiff to show "that he was paid less than a member of a different race was paid for work requiring substantially the same responsibility." *Gibbons*, 108 F. Supp. 2d at 1318.

Here, Gipson's claim does not fall neatly into the *prima facie* wage discrimination framework. In an unpublished *per curiam* opinion, however, the Eleventh Circuit has held that the plaintiff in a race-based wage discrimination case must present a comparator who received higher compensation. *Walker v. Fulton Cnty. Sch. Dist.*, 624 F. App'x 683, 686 (11th Cir. 2015). Gipson cannot do this. In *Walker*, the plaintiff, a school teacher, alleged that his employer discriminated against him by failing to provide him with supplemental pay for teaching an additional orchestra class while other teachers were provided this supplement when they taught additional classes. *Id.* at 684. For a comparator, the plaintiff used another school teacher who taught the same number of courses. *Id.* at 687. The Eleventh Circuit denied the plaintiff's claim because it was undisputed that the plaintiff was paid more than the comparator, and thus the comparison was inappropriate. *Id.* Accordingly, the court determined that the other school teacher could not be used as a comparator to establish a *prima facie* case of wage discrimination.

Here, at the time of the October 2012 pay decision, Gipson was making more money than Payne. Before the allegedly discriminatory raises took place, Gipson was making $20 per hour. Doc. 73-25 at 41. Payne was making less, at $18 per hour. Doc. 73-25 at 41. Even after the raise was applied, Gipson still made more than Payne, at $20.32 per hour and $19 per hour respectively. Doc. 73-25 at 41. Thus, consistent with *Walker*, which the court finds to be instructive, Payne cannot serve as an appropriate comparator. Because Payne is the only comparator on whom Gipson relies, he has not established a *prima facie* case of wage discrimination under *McDonnell Douglas*.

### b.   Demotion from Supervisor to Team Leader

Gipson has not presented sufficient evidence for a reasonable juror to conclude that

race was a motivating factor in the decision to demote him from Supervisor to Team Leader. "When an employee raising a mixed-motive claim relies solely on remarks that indirectly evidence discrimination, the employee must show the circumstances surrounding the remarks create a genuine issue of material fact that the employer 'actually relied on [the protected characteristic] in making its decision.'" *Quigg*, 814 F.3d at 1241 (quoting *Price Waterhouse v. Hopkins*, 490 U.S 228, 251 (1989)). Thus, while statements made by non-decisionmakers might provide adequate circumstantial evidence that a decisionmaker's actions were influenced by racial bias, those statements still must suggest that the decisionmaker considered race in deciding to take action. *Burton*, 2018 WL 6259631, at *4; *Smith v. Metro Mech., Inc.*, 2018 WL 1064410, at *3 (N.D. Ala. Feb. 27, 2018) (quoting *Quigg*, 814 F.3d at 1235–36) ("Where mixed-motive discrimination claims are established with circumstantial evidence, the evidence merely 'suggests, but does not prove, a discriminatory motive.'"). For example, when a non-decisionmaker states that an employer will "continue to promote based on color," there is sufficient circumstantial evidence that the decisionmakers base their decisions on race. *Burton*, 2018 WL 6259631, at *4 (internal citation omitted).

In *Quigg*, 814 F.3d at 1241, the court determined that the plaintiff presented sufficient circumstantial evidence for a reasonable juror to conclude that race was a motivating factor behind the decisionmakers' actions. The plaintiff in *Quigg* was selected as School Superintendent in 2007. *Id.* at 1233. Her contract was scheduled either to be renewed or terminated in 2011, and a seven-member school board was responsible for making the decision. *Id.* In 2008, 2009, and 2010, the School Board gave the plaintiff satisfactory or above-satisfactory performance evaluations. *Id.* But multiple board

members reported in their individual evaluations that she did not meet expectations on a number of criteria. *Id.* Prior to the 2011 vote on her contract, two school board members, Morgan and Nesmith, told the plaintiff to reorganize the administration to provide for an assistant superintendent—a tough "hatchet man" to address school policy implantation and a "guy" she could send to schools to "handle" things. *Id.* They recommended a specific male employee, but the plaintiff suggested a woman. *Id.* One of the two board members, Morgan, questioned, "We have no males in the school system?" *Id.* Another time Morgan asked, "What about a guy in this position? . . . I'm just being honest about that, you know, a guy will—and I was just thinking from the standpoint of an offset." *Id.* Nesmith told a parent that "it is time to put a man in there." *Id.* at 1234. At the 2011 meeting to decide the fate of her contract, the plaintiff did not recommend a male assistant superintendent, but instead recommended a plan providing for various directors. *Id.* Five board members, including Nesmith and Morgan, voted against renewing her contract. *Id.* A third member who voted against her told a school district employee that she did so because the plaintiff "needed a strong male to work under her to handle problems, someone who could get tough." *Id.* The Eleventh Circuit found that the various comments made by the three board members served as sufficient evidence for a reasonable jury to conclude that gender was a motivating factor in the decision not to renew the plaintiff's contract because "statements by the board's members or others involved with the board's decision process that suggest bias can serve as evidence of discrimination." *Id.* at 1242.

Here, on the other hand, Gipson has not provided adequate circumstantial evidence indicating that Park considered race when deciding to demote him. Unlike in *Quigg*, where one decisionmaker explicitly stated that she took adverse action against the plaintiff

because the plaintiff needed help from a man, Gipson has not presented any direct evidence indicating that Park demoted him because of his race.   And, unlike in *Quigg*, where circumstantial evidence revealed that decisionmakers made multiple comments about gender to the plaintiff, Gipson has presented no evidence that Park ever commented on his race or any race.   Nor does Gipson present evidence from a non-decisionmaker that Park will or does take action on the basis of race. *See Burton*, 2018 WL 6259631, at *4.

The evidence upon which Gipson relies does not meet the test articulated in *Quigg*. Gipson attempts to argue that Arkuszeski's comments in reference to the 2014 petition and 2015 protest against Payne are sufficient to demonstrate that race played a motivating factor in his demotion. Doc. 86 at 39.  But Arkuszeski's comment that Gipson was "behind this f*** s***" does not indicate that Park considered race in deciding to take action.  Even if race did play a role in the 2014 petition and 2015 protest (Doc. 73-3 at 473), Arkuszeski's comment about the situation does not reflect the motivation for Park's later decision. Gipson also notes that Arkuszeski decreased his evaluation score during the evaluation cycle after the 2014 petition (Doc. 86 at 38; Doc. 73-25 at 62; Doc. 73-19 at 68–69), but again, this fact does not indicate that Park was motivated by race when he decided to demote Gipson.  Nor does the fact that Gipson was demoted one month after making a racial discrimination complaint to Park, Arkuszeski, and Wojciehowski (Doc. 86 at 39) demonstrate that race was a motivating factor in Park's decision.   Likewise, Wojciechowski's refusal to tell Gipson the reason for his demotion cannot reasonably be interpreted as proof that race motivated Park. Doc. 86 at 39.  Because Gipson has not presented evidence from which a reasonable juror could conclude that the decisionmaker considered race when demoting him, summary judgment on this claim is appropriate.

5.      *Title VII and § 1981 Retaliation Claims*[9]

Gipson's retaliation claims cannot survive summary judgment.  Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (quoting 42 U.S.C. § 2000e-3(a)).  An internal complaint of discrimination is protected under Title VII. *See Rollins v. St. of Fla. Dep't of Law Enf.*, 868 F.2d 397, 400 (11th Cir. 1989) ("[W]e recognize that the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures.").  Unlike other discrimination claims under Title VII, retaliation claims must be proven according to the traditional principles of but-for causation, not the motivating-factor standard articulated in § 2000e-2(m). *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013).  To state a claim for retaliation, a plaintiff must allege that (1) she participated in an activity protected by Title VII, (2) she suffered an adverse employment action, and (3) but-for her participation in the protected activity she would not have suffered the adverse employment action. *See id.* at 362.

Here, HPT argues that Gipson's retaliation claim fails because (1) he cannot

---

[9] "In the employment context, the same substantive analysis applies to § 1981 and Title VII claims of retaliation." *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, n. 3 (11th Cir. 2011) (citing *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994)).

establish a *prima facie* case of retaliation, (2) HPT has a legitimate, non-retaliatory reason for its actions, and (3) Gipson cannot establish pretext. Doc. 72 at 40.

### a.  *McDonnell Douglas*

"If the plaintiff makes out a *prima facie* case, and the employer articulates a legitimate, nondiscriminatory reason for the adverse action, then the plaintiff bears the burden of showing that the reason offered was merely pretextual." *King v. Sec'y, U.S. Dep't of the Army*, 652 F. App'x 845, 847 (11th Cir. 2016) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (1th Cir. 2002)). "To establish pretext, a plaintiff must come forward and show, by a preponderance of the evidence, that the reason given by the employer was not the real reason for the adverse employment decision, but was a pretext for discrimination." *Id.* Although the court finds that Gipson has introduced sufficient evidence to carry his *prima facie* burden on his retaliation claims, he has not demonstrated pretext because, in his response to the summary judgment motion, Gipson entirely failed to respond to HPT's proffered legitimate, nondiscriminatory reason for his demotion.

### i.  *Prima Facie* **Case**

Gipson has established a *prima facie* case of retaliation.  Gipson engaged in protected activity when he filed an internal complaint of racial discrimination with Wojciehowski, Park, and Arkuszeski. *See Rollins*, 868 F.2d at 400.  And he suffered an adverse employment action when he was demoted from Supervisor to Team Leader. *See Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) ("In a Title VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility.")

Gipson also has satisfied the causation element.  To prove causation, "the plaintiff must generally show that the decisionmaker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (internal citations omitted).  "According to Eleventh Circuit precedent, a plaintiff satisfies the causal-connection element if he provides sufficient evidence of a close temporal proximity between the employer's awareness of the protected conduct and the adverse employment action." *Hill v. Manning*, 236 F. Supp. 2d 1292, 1300 (M.D. Ala. 2002) (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999)).  Thus, in the absence of direct evidence, the burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. *See Brungart*, 231 F.3d at 798–99.  The standard for measuring the closeness of temporal proximity focuses on when "the decisionmaker became aware of the protected conduct, and that there was close temporal proximity between the awareness and the adverse employment action." *Farley*, 197 F.3d at 1337. "But mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal citation omitted).  "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough" to establish causation. *Id.*  A gap of one month, on the other hand, generally is sufficient to establish a causal nexus. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986).

Here, Gipson filed an internal complaint of discrimination in June 2016 with Wojciehowski, Park, and Arkuszeski. Doc. 86 at 25.  Less than one month later, on June 25, 2016, Park made the decision to demote Gipson.  The temporal proximity between

Gipson's complaint and demotion satisfies the causation element. Because Gipson has demonstrated that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action because of it, and (3) the activity was the cause of the adverse action, he has established a *prima facie* case of retaliation.

### ii. Legitimate Nondiscriminatory Reason

Under the *McDonnell Douglas* framework, "if the plaintiff established a *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Crawford*, 529 F.3d at 976 (internal quotation and citation omitted). "The employer's initial showing, just as the plaintiff's, is a low bar to hurdle." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). As previously discussed, "[t]he burden placed on the employer is only an evidentiary one: a burden of production that can involve no credibility assessment, and that is exceedingly light." *Alexander v. Chattahoochee Valley Comm. College*, 325 F. Supp. 2d 1274, 1280 (M.D. Ala. 2004) (internal citation and quotation marks omitted).

HPT argues that "the demotion was based on Mr. Park's observations, which are confirmed by Gipson's and Payne's prior performance evaluations, as well as comments from trainers and other team members." Doc. 72 at 41. To support this assertion, HPT points to Park's deposition testimony that Gipson lacked the ability to manage other employees (Doc. 73-8 at 87:9–13), that Gipson was not leading the workers efficiently (Doc. 73-8 at 104:8–17), that other employees complained to him about Gipson (Doc. 73-8 at 170:7–23), and that Park himself had talked to Gipson about improving his managerial skills. Doc. 73-8 at 178:9–21. HPT therefore has put forth a legitimate, nondiscriminatory reason for demoting Gipson, and it has produced admissible evidence lending credence to

this justification.   HPT has satisfied its "exceedingly light" burden of production. *Alexander*, 325 F. Supp. 2d at 1280.

### iii.   Pretext

Because HPT has articulated a legitimate, nondiscriminatory reason for demoting Gipson, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford*, 529 F.3d at 976 (internal citations omitted). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010) (internal citation omitted).   Gipson has ignored this burden.   It is not the district court's obligation "to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).   "Accordingly, the Court limits its review to those legal arguments the parties have expressly advanced." *Patrick*, 832 F. Supp. 2d at 1360.  Gipson's response to the motion for summary judgment does not address pretext.  While he argues that he sufficiently established causation for purposes of summary judgment, he is silent as to HPT's proffered non-discriminatory reason or any claim that it is pretextual.  Because Gipson has not advanced an argument concerning pretext, the court finds that summary judgment on Gipson's retaliation claim is appropriate.

### b.   Convincing Mosaic

Alternatively, Gipson's retaliation claim fails under the convincing mosaic standard.  The Eleventh Circuit has held that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of

circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation and citation omitted). "A plaintiff's claim will also survive summary judgment if he otherwise presents enough circumstantial evidence to raise a reasonable inference that an adverse action was taken against him in violation of Title VII." *Long v. Ala. Dep't of Human Res.*, 650 F. App'x 957, 968 (11th Cir. 2016). "A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that retaliatory intent motivated an employment decision." *Minnifield v. City of Birmingham*, 325 F.R.D. 450, 468 (N.D. Ala. 2018). "If the circumstantial evidence supports a reasonable inference that the employer retaliated against the plaintiff, then summary judgment is improper." *Moore v. Pool Corp.*, 304 F. Supp. 3d 1148, 1162 (N.D. Ala. 2018). "A convincing mosaic may by shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (internal quotation and citations omitted).

Here, Gipson has not presented a convincing mosaic of circumstantial evidence that would allow a jury to infer that retaliatory intent motivated the decision to demote him. As before, this court will limit its review to the retaliation arguments made in Gipson's reply brief.

Gipson cites to the following pieces of evidence to support his retaliation claim:

(1) thirty[10] employees working under Payne signed a petition complaining of racism in 2015; (2) Wojciechowski gave Payne a copy of the petition, and Payne stated that he was out to get everyone who signed the petition against him; (3) after the petition was signed, Arkuszeski scored Gipson lower during the next round of evaluations, (4) Payne was promoted to Senior Supervisor in September of 2015; (5) as a result of Payne's promotion, employees staged a protest, (6) when Gipson sought help to diffuse the protest, Arkuszeski refused and accused Gipson of organizing the protest; (7) in June 2016, Gipson complained that Payne racially discriminated against him, (8) other employees recognized that Payne was treating African Americans in a racially discriminatory manner; (9) Gipson was demoted less than a month later after making his internal complaint; and (10) when asked for an explanation of the demotion, Wojciechowski refused to provide one. Doc. 86 at 42–43.

Retaliation involves conduct that occurs after an employee engages in protected activity.  Accordingly, Gipson's first six pieces of evidence bear little relation to whether Park demoted Gipson in retaliation for his complaint.  Thus, Gipson principally relies on the following evidence to prove that Park retaliated against him: (1) less than a month after making an internal complaint, he was demoted; and (2) when he asked for an explanation of his demotion, Wojciechowski refused to provide one.  As discussed above, the timing of Gipson's demotion is meaningful in that he was demoted within 30 days of making an internal complaint about racial discrimination. Doc. 73-20 at 91.  But the other evidence does not create a convincing mosaic that would allow a reasonable juror to infer that Park

---

[10] Although Gipson maintains that 30 employees signed the petition, the petition is in evidence and it reveals the printed names and signatures of only 15 employees. Doc. 73-22 at 21–22.

retaliated against Gipson.  There is no evidence that Park investigated Gipson for making his complaint of race discrimination. *See Long*, 650 F. App'x at 963 (finding relevant that the decisionmaker launched an investigation of the plaintiff focused on his protected activity).  And there is no other circumstantial evidence that Park was motivated by Gipson's internal complaint. *See id.* at 969 (noting comments suggesting the decisionmaker was motivated by the plaintiff's protected activity).  Nor is there any evidence that Park was critical of Gipson's decision to make an internal complaint.  The evidence upon which Gipson relies to demonstrate his retaliation claim does not amount to a convincing mosaic of discriminatory intent.  Accordingly, summary judgment should be granted as to this claim.

## V.  CONCLUSION

For these reasons, it is RECOMMENDED that:

1.      Defendants' Motion to Strike (Doc. 92) be DENIED in part and GRANTED in part, as described above.

2.      Defendants' Motion for Summary Judgment (Doc. 71) be DENIED in part and GRANTED in part, as described above.

3.      Gipson's state-law claims, harassment claims, Title VII failure-to-promote claim, demotion claims, and retaliation claims be DISMISSED with prejudice.

It is furthered ORDERED that the parties are DIRECTED to file any objections to the report and recommendation on or before **May 8, 2019.**  Any objections filed must specifically identify the findings in the Magistrate Judge's report and recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.   The parties are advised that this report and

recommendation is not a final order of the court, and, therefore, is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report and recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the report and recommendation and shall bar the party from attacking on appeal the factual findings in the report and recommendation accepted or adopted by the District Court, except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE on the 24th day of April, 2019.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE